IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DENNIS GALLAGHER and
SHELLEY GALLAGHER,

        Plaintiffs,                No. 2:08-cv-03071 JFM

  vs.

TERRY J. HOLT and
JERRI A. WELLS,

        Defendants.             ORDER

_____/

The parties' cross-motions for summary judgment came on regularly for hearing January 28, 2010. William Parish appeared for plaintiffs. Donald Ullrich, Jr., appeared for defendants. Upon review of the motions and the documents in support and opposition, upon hearing the arguments of counsel and good cause appearing therefor, THE COURT FINDS AS FOLLOWS:

**FACTS**

Plaintiff Dennis Gallagher and his family have farmed rice and walnuts for over thirty years, including the 709 acres of farmland ("709 property") at issue in this matter. (Gallagher Decl. ¶ 2.) Over the years, the Gallagher family has provided all of the custom farming services for the 709 property. (Id.) These services include, among other things, planting and growing the rice crop, drying and storing it, and managing the farm property. (Id.)

1

In 1980, Robert Gallagher (plaintiff Dennis Gallagher's father) purchased the 709 property from Kenneth Majors[1], Allen Johnson[2], and others. (Gallagher Decl. ¶ 3.) To accomplish this purchase, Robert Gallagher made a down payment and Mr. Majors, Mr. Johnson, and the others carried back a note for the balance secured by a deed of trust. (Id.)

In 1983, Robert Gallagher experienced financial difficulties that caused him to file for bankruptcy. (Gallagher Decl. ¶ 3.) In light of these difficulties, plaintiff Dennis Gallagher negotiated a plan whereby Robert Gallagher transferred the 709 property back to Mr. Majors, Mr. Johnson, and the other individuals through a deed in lieu of foreclosure. (Id.) Eventually Mr. Majors and Mr. Johnson acquired the other partners' interest and they operated the 709 property under M&J Farms. (Id.) The Gallagher family continued to provide all of the custom farming services for the 709 property. (Id.)

From the time Robert Gallagher deeded back his interest to Mr. Majors and Mr. Johnson, it was apparently agreed that Robert Gallagher and plaintiff Dennis Gallagher would ultimately reacquire a one-half ownership in the 709 property. (Gallagher Decl. ¶ 4.) To achieve this, in 1986, Robert Gallagher[3], plaintiff Dennis Gallagher, Mr. Majors and Mr. Johnson made an oral agreement ("the oral agreement") that would result in the 709 property being half-owned by the Gallaghers and half-owned by Mr. Majors. (Id.)

Under the terms of this oral agreement, the shares in the 709 property were redistributed so as to maximize farm program payments. (Gallagher Dep. at 32; Gallagher Decl. ¶ 4.) Although Mr. Majors and Mr. Johnson initially had equal ownership interests in the 709 property, they restructured their ownership shares such that Mr. Majors's daughters, defendants

---

[1] Mr. Majors is now deceased. (Ullrich Decl, Ex. H.)

[2] Mr. Johnson suffers from dementia and is unable to participate in these proceedings. (Ullrich Decl., Ex. G.)

[3] Robert Gallagher eventually transferred all of his rights in the 709 property to his son, plaintiff Dennis Gallagher. (Pls.' Mot. for Summ. J. at 2 n.2.)

Terry Holt and Jerri Wells, each acquired an undivided one-third interest through a series of conveyances, a portion of which was transferred from Mr. Johnson to the defendants; and Mr. Johnson retained the remaining one-third interest. (Gallagher Decl. ¶ 4; Ullrich Decl., Ex. C.) Mr. Johnson's interest in the 709 property, thus, was reduced from one-half to one-third. (Gallagher Decl. ¶ 4.)

Per the oral agreement and upon the completion of its terms, the Gallaghers were granted a written option to purchase Mr. Johnson's one-third interest for the fair market value of a one-half interest (which Mr. Johnson owned prior to the restructure), and Mr. Majors agreed that the remaining one-sixth interest in the 709 property – for the Gallaghers to have a total one-half interest – would come from the defendants. (Gallagher Decl. ¶ 4.)

Plaintiff Dennis Gallagher testified that there was a written option agreement prepared by Mr. Majors to be signed by the defendants concerning the eventual transfer of the 709 property. (Gallagher Dep. at 77-82; Majors Dep., Ex. B.) Over the course of the years, plaintiff Dennis Gallagher asked Mr. Majors repeatedly when the option agreement would be signed by the defendants and was continually reassured that the defendants' signatures would be obtained. (Gallagher Dep. at 78.) This option agreement was never signed by the defendants. (Id. at 77-82.) Plaintiff Dennis Gallagher testified that there was no agreement to pay the defendants any sum of money for the property. (Gallagher Dep. at 39.)

After the defendants acquired the two-thirds interest in the 709 property, JHW Farms was formed, which became the entity that operated the 709 property. (Gallagher Decl. ¶ 5.) In reliance on the oral agreement, plaintiff Dennis Gallagher provided all custom farming services for the 709 property at cost and took no management fee for over twenty years. (Id. ¶ 6.) Plaintiffs value these services at more than $300,000.00. (Id.) They claim that over the years, these farming activities also secured significant profits for JHW Farms, which they estimate at $1,000,000.00. (Id.)

/////

3

During the tenure of their ownership, the defendants did not participate in the property's management or operations. (Gallagher Decl. ¶ 4.) Defendants were unaware of any work that plaintiff Dennis Gallagher performed in reliance on the oral agreement. (Carsello[4] Dep. at 17; Mace[5] Dep. at 31, 48.) Their only involvement in the 709 property was their receipt of yearly K-1 statements. (Mace Dep. at 24.) It was their understanding that the property did not profit, but instead experienced yearly losses. (Mace Dep. at 24.) They were further unaware whether their father, Mr. Majors, ever received money on the property. (Mace Dep. at 25.)

In December 2006, as plaintiffs neared the completion of the terms of the oral agreement, plaintiff Dennis Gallagher met with the defendants to discuss the oral agreement and the transfer of the one-sixth interest; this was the first time that the defendants became aware of the oral agreement. (Gallagher Decl. ¶ 7; Mace Dep. at 39.) During this meeting, plaintiff Dennis Gallagher gave the history of the 709 property and discussed the custom farming and management services he provided over the years. (Id.) Defendants were assisted by their uncle, Jack Majors, who conducted independent research regarding the oral agreement. (Carsello Dep. at 18.)

On January 5, 2007, plaintiffs signed the "Real Property Transfer Agreement with Escrow Instructions" ("the contract"). (Compl., Ex. A.) The contract provided for the transfer of an undivided one-twelfth interest of the 709 property from each defendant to the plaintiffs. (Id.) The stated purpose of the transfer was "to complete the agreement among the parties as to how title shall be held after payment of all third party debts on the Property that existing in 1980, which debts have been paid." (Id.) In consideration for the exchange, plaintiffs agreed to payment "of all closing costs, including transfer taxes, recording fees, escrow fees and related charges." (Id.)

---

[4] Defendant Jerri A. Wells is now Jerri A. Carsello. (Carsello Dep. at 4.)

[5] Defendant Terry J. Holt is now Terry J. Mace. (Mace Dep. at 4.)

On February 28, 2007, defendant Terry Mace signed the contract. (Compl., Ex. A.) She signed it with the understanding that it was an agreement to transfer the 709 property to the plaintiffs. (Mace Dep. at 10.) On March 3, 2007, defendant Jerri Carsello signed the contract. (Id.) She, too, signed it with the understanding that it was an agreement to transfer the 709 property. (Carsello Dep. at 11.) Defendant Terry Mace testified that she signed the contract because "it was the right thing to do" in light of the information she had received from Jack Majors and the plaintiffs regarding the oral agreement. (Mace Dep. at 20.) In anticipation of the transfer, plaintiffs opened an escrow account with Placer Title Company. (Gallagher Decl. ¶ 10.)

Following the execution of the contract, the defendants received notice of a separate agreement (the "Borel agreement") dated March 2007, which was to be signed by Mr. Johnson (represented through a power of attorney by his daughter, Sherri Johnson) and the defendants. (Carsello Dep. at 10; see Pls.' Ex. 5.) Per the Borel agreement, plaintiff Dennis Gallagher was scheduled to receive a wire transfer from the JHW Farms checking account in the amount of $200,000.00 "for his management and consulting services" he provided for the 709 property. (See Pls.' Dep. Exs., Ex. 5 ¶ 3.)

On March 7, 2007, a wire transfer to plaintiff Dennis Gallagher was attempted in the amount of $200,000.00. (Mace Dep. at 10.) Defendant Terry Mace received a call from the bank regarding the transfer, whereupon she and her sister first became aware of the Borel Agreement. (Id. at 15-16.) They stopped the wire transfer and then cancelled the contract for the transfer of the 709 property. (Id. at 10, 15.) Both defendants testified that they did so because they felt the parties to the contract and the Borel Agreement – including the plaintiffs, Jack Majors, and Sherri Johnson – were not forthright with them. (Mace Dep. at 43-44; Carsello Dep. at 13-14.)

Following the defendants' cancellation of the contract, plaintiff Dennis Gallagher exercised his written option and purchased Mr. Johnson's interest in the 709 property for

/////

5

$600,000.00, the amount he owed under the oral agreement. (Gallagher Decl. ¶ 6; Ullrich Decl., Ex. A.)

## PROCEDURAL BACKGROUND

On December 17, 2008, plaintiffs Dennis and Shelley Gallagher filed a complaint against defendants Terry J. Holt (now Terry J. Mace) and Jerri A. Wells (now Jerry A. Carsello). (Doc. No. 2.) With jurisdiction based on diversity, plaintiffs seek specific performance of a contract and damages for breach of contract. On March 3, 2009, defendants filed an answer. (Doc. No. 7.)

On December 30, 2009, plaintiffs filed a motion for summary judgment. (Doc. No. 18.) Plaintiffs assert there is no dispute as to any material fact and they, therefore, are entitled to specific performance on the contract plus incidental damages in addition to contractual damages for breach of contract.

Also on December 30, 2009, defendants filed a motion for summary judgment. (Doc. No. 26.) Defendants assert the written contract is invalid for want of consideration. They further assert that conditions precedent to conveyance were either not satisfied or excused. Finally, they seek summary adjudication that the oral agreement is unenforceable under California's Statute of Frauds and is consequentially inadmissible in any trial on the merits of this case.

/////

## SUMMARY JUDGMENT STANDARDS UNDER RULE 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district
> court of the basis for its motion, and identifying those portions of
> "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.
</blockquote>

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

## ANALYSIS

The plaintiffs' first cause of action is specific performance. Plaintiffs assert (1) there is a presumption of consideration in the contract per California statute; (2) consideration exists on the face of the contract; and (3) consideration exists in the form of past performance, namely, plaintiffs' provision of custom farming services valued at approximately $300,000 in reliance on the oral agreement. The plaintiffs' second cause of action is for breach of contract.
/////

Plaintiffs claim the contract is valid and enforceable, and that they have suffered harm as a result of the defendants' breach.

The defendants, on the other hand, assert the contract is invalid in that it lacks adequate consideration. They claim they would have received no sum of money for the property at issue, thus rendering the transaction donative in nature and rescindable at will. They further claim that payment of closing and escrow costs does not negate the donative nature of the transfer. Finally, the argue that the oral agreement upon which the contract is premised is unenforceable under California's statute of frauds.

**A.      Specific Performance**

In California, the material factors to be ascertained to support a contract for the sale of real property are: (1) the seller; (2) the buyer; (3) the price; (4) the time and manner of payment; and (5) the description of the property. Blackburn v. Charnley, 11 Cal. Rptr. 3d 885, 891 (Cal. Ct. App. 2004). Upon review, the court finds all material factors present in the contract: the defendants obligated themselves to transfer the 709 property in exchange for the payment of closing costs and various fees to be paid by the plaintiffs.

The remedy for a breach of contract may be either in law or in equity. See Glock v. Howard & Wilson Colony Co., 55 P. 713, 715 (Cal. 1898). When, however, the contract purports to convey real property, California presumes that the breach "cannot be adequately relieved by pecuniary compensation." Cal. Civ. Code § 3387. Otherwise stated, California presumes that specific performance is the appropriate remedy in a breach of contract action concerning real property.

Here, then, specific performance may be ordered if (1) the contract's terms are sufficiently definite; (2) consideration is adequate; (3) there is substantial similarity of the requested performance to the contractual terms; (4) there is mutuality of remedies; and (5) plaintiff's legal remedy is inadequate. See Blackburn, 11 Cal. Rptr. at 891.

/////

As to the first requirement, the terms of a contract are "sufficiently definite" when the following are identifiable: (1) the seller; (2) the buyer; (3) the price; (4) the time and manner of payment; and (5) the description of the property. Blackburn, 117 Cal. Rptr. 3d at 891. As discussed above, the court finds these elements identifiable.

Per the second requirement, there must be adequate consideration in a contract for the sale of real property. Cal. Civ. Code § 3391; Blackburn, 11 Cal. Rptr. 3d at 891. Consideration is defined as "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person . . . as an inducement to the promisor, is a good consideration for a promise." Cal. Civ. Code § 1605. Further, a written instrument is presumptive evidence of a consideration. Id. § 1614.

Consideration in a contract for real property, however, requires more than consideration on the face of a contract. See Cal. Civ. Code § 3391. Specific performance cannot be enforced against a party to a contract unless the consideration is adequate, just and reasonable. Id. The burden of showing a want of consideration sufficient to support a contract lies with the party seeking to invalidate it. Id. § 1615.

"[T]he proper way to plead adequacy of the consideration is to allege the fair and reasonable value of the property and the price agreed to be paid therefor." Foley v. Cowan, 181 P.2d 410, 413 (Cal. Ct. App. 1947). "In determining whether consideration was fair and adequate, all circumstances surrounding the transfer of the property as they existed at that time, must be considered." Lundgren v. Lundgren, 54 Cal. Rptr. 30, 34 (Cal. Ct. App. 1966). "A consideration, to be adequate, need not amount to the full value of the property." Foley v. Cowan, 181 P.2d 410, 413 (Cal. Ct. App. 1947). The test "is not whether the [defendants] received the highest price obtainable for [their] property, but whether the price [they] received is fair and reasonable under the circumstances." Henderson v. Fisher, 46 Cal. Rptr. 173, 178 (Cal. Ct. App. 1965).

At the time of the breach, plaintiffs value the defendants' combined one-sixth interest in the 709 property at $666,666.67. (Evans Decl. ¶ 6.) In exchange for the transfer of this combined interest, plaintiffs agreed to pay all closing costs, including transfer taxes, recording fees, escrow fees and related charges. (Compl., Ex. A.)

In addition to the consideration on the face of the contract, the plaintiffs rely upon the defendants' moral obligation. That is, the plaintiffs' argue that prior to signing the contract, the defendants were aware of the motive of the contract (to accomplish the terms of the oral agreement) and the extent of the plaintiffs' reliance upon the oral agreement (their provision of custom farming services at cost and management services for free for over twenty years) and, thus, were obligated to enforce the contract based on this information.

In California, "a moral obligation originating in some benefit conferred upon the promisor, or prejudice suffered by the promisee, is ... a good consideration for a promise, to an extent corresponding with the extent of the obligation, but no further or otherwise." Cal. Civ. Code § 1606. This has been interpreted by the California Supreme Court to mean that "a moral obligation is sufficient to support an express promise, where a good and valuable consideration has once existed." In re McConnell's Estate, 6 Cal. 2d 493, 498 (Cal. 1936). That is, "absent estoppel, a moral obligation resting in prejudice to the promisee alone, without an antecedent legal obligation owed by the promisor, is [in]sufficient." Leonard v. Gallagher, 45 Cal. Rptr. 211, 219 (Cal. Ct. App. 1965). Thus, a moral obligation provides consideration for a new promise to pay a time-barred debt only because that debt is, but for the statute of limitations, enforceable. Easton v. Ash, 116 P.2d 433, 435-36 (Cal. 1941). "[A] mere moral obligation unconnected with a past perfect or imperfect legal consideration, will not support a subsequent executory promise." Dow v. River Farms Co. Of Cal., 243 P.2d 95, 98-99 (Cal. Ct. App. 1952).

Here, the court finds no evidence that the defendants had an antecedent legal obligation to the plaintiffs. Although their decision to sign the agreement was to "do the right thing," this moral obligation was not preceded by a separate past perfect or imperfect legal

consideration. See Dow, 243 P.2d at 98-99. The defendants were not parties to the oral agreement and, in fact, were unaware of its existence until just prior to signing the written contract. As plaintiff Dennis Gallagher testified, while there was a written option agreement as to the defendants that was prepared by Mr. Majors, it was never signed by either defendant. To the extent the plaintiffs rely upon the oral agreement as proof of an antecedent legal obligation, and assuming arguendo such evidence is admissible under the parol evidence rule[6], the plaintiffs fail to cite to any law that imposes upon the defendants a legal obligation vis-a-vis an oral agreement entered into by their father.

Based thereon, the court excludes the defendants' alleged moral obligation and turns now to determine whether there was adequate consideration in the contract. Although there is no evidence as to the value of the closing costs, including transfer taxes, recording fees, escrow fees and related charges, the court relies on California case law to guide it in determining the adequacy of the consideration. Cornblith v. Valentine, 294 P. 1065 (Cal. 1930) (an exchange of $ 4,100 equity for $ 6,200 equity found to be inadequate); Boulenger v. Morison, 264 P. 256 (Cal. Ct. App. 1928) (a contract price of $ 30,000 for property valued at $35,000 found to be inadequate); and Haddock v. Knapp, 151 P. 1140 (Cal. 1915) (an exchange of an $1,800 parcel for $2,500 equity found to be inadequate). In that light, the court finds that no rational trier of fact would find adequate consideration in an exchange of land valued at $666,666,67 for the payment of various taxes and escrow closing costs. See Matsushita, 475 U.S. at 587.

Because the finding of inadequacy of consideration alone is sufficient to sustain the judgment herein, see Paratore v. Perry, 48 Cal. Rptr. 682, 685 (Cal. Ct. App. 1966), the court need not address the remaining requirements for a contract for the transfer of real property.

Accordingly, the court hereby denies plaintiffs' motion for summary judgment

---

[6] Parol evidence that does not vary or contradict the written terms of the contract is admissible to explain the ambiguities or give meaning and content to words used, provided it does not vary or contradict the terms of the contract. Hennefer v. Butcher, Cal. Rptr. 318, 322 (Cal. Ct. App. 1986).

1 and grants defendants' motion for summary judgment as to the plaintiffs' action for specific performance.

**B.        Damages for Breach of Contract**

Although an action for specific performance may not be established, damages may properly be awarded.  See Baran v. Goldberg, 86 Cal. App. 2d 506, 510-11 (Cal. Ct. App. 1948). Nonetheless, "it seems to be a general rule that in a suit for specific performance or damages the plaintiff must allege and prove an adequate consideration."  Cushing v. Levi, 117 Cal. App. 94, 102-03 (Cal. Ct. App. 1931).  For the reasons discussed above, the court does not find the consideration in the contract to be adequate.

Therefore, the court hereby denies the plaintiffs' motion for summary judgment and grants the defendants' motion for summary judgment as to plaintiffs' action for damages for breach of contract.

**CONCLUSION**

In accordance with the above, IT IS HEREBY ORDERED that the plaintiffs' December 30, 2009 motion for summary judgment is denied and the defendants' December 30, 2009 motion for summary judgment is granted.  Judgment shall be entered for defendants, and this action dismissed.  Each side to bear their own fees and costs.

DATED:  February 23, 2010.

_____
UNITED STATES MAGISTRATE JUDGE

/014; gallagher.msj