1

2

3

4

5              IN THE UNITED STATES DISTRICT COURT

6           FOR THE EASTERN DISTRICT OF CALIFORNIA

7   DENNIS GALLAGHER and
    SHELLEY GALLAGHER,
8
                    Plaintiffs,              No. 2:08-cv-03071 JFM (C)
9           vs.

10  TERRY J. HOLT and
    JERRI A. WELLS,
11
                    Defendants.              <u>ORDER</u>
12  _____/

13          The parties' cross-motions for summary judgment came on regularly for hearing

14  on May 17, 2012[1]. William Parish appeared for plaintiffs. Donald Ullrich, Jr., appeared for

15  defendants. Upon review of the motions and the documents in support and opposition, upon

16  hearing the arguments of counsel and good cause appearing therefor, THE COURT FINDS AS

17  FOLLOWS:

18                   RELEVANT FACTUAL BACKGROUND[2]

19  I.      <u>Introduction</u>

20          Plaintiff Dennis Gallagher and his family have farmed the 709 acres of rice land

21  at issue in this case ("the 709 Property") for over thirty years. Gallagher Decl. ¶ 2. They have

22  also provided all of the custom farming services for the 709 property. <u>Id.</u> These services include

23  preparation of the land for planting rice, field labor, ground spraying and pre-plant fertilization,

24  _____

25          [1] This matter is before the undersigned based on the consent of the parties. 28 U.S.C.
    § 636(c). <u>See</u> Doc. Nos. 11, 12.

26          [2] All facts are undisputed unless noted otherwise.

                                    1

deep well pump maintenance and service, harvest, drying and storing rice, marketing the rice, and general management of the farm.  Id.

Between 1980 and 1983, the 709 Property was owned by Robert Gallagher, plaintiff Dennis Gallagher's father.  Gallagher Decl. ¶ 3.  In 1983, Robert Gallagher experienced financial difficulties, causing him to file for bankruptcy.  Id.  To emerge from these hardships, plaintiff Dennis Gallagher negotiated a plan whereby his father transferred the 709 Property to, among others, Kenneth Majors[3] and Allen Johnson[4] through a deed in lieu of foreclosure.  Id. Even with the transfers, though, plaintiffs continued to provide all farming services for the 709 Property.  Id.

Although the 709 Property was initially owned equally by Majors and Johnson, the ownership interests were eventually restructured such that Majors's daughters, defendants Terry Holt[5] and Jerri Wells[6], acquired a two-third interest, and Johnson's interest was reduced to one-third.  Gallagher Decl. ¶ 5.  This restructuring was done to maximize farm program payments for the 709 Property.  Id.  During the tenure of their ownership of the 709 Property, defendants did not participate in the property's management or operations.  Id.

II.   The Oral Agreement

From the time Robert Gallagher deeded his interest to Majors and Johnson, it was agreed that Robert Gallagher and plaintiff Dennis Gallagher would ultimately reacquire a one-half ownership in the 709 property.  Gallagher Decl. ¶ 4.  In furtherance of this goal, Robert

---

[3]  Majors is now deceased.  Ullrich Decl, Ex. H.

[4]  Johnson suffers from dementia and is unable to participate in these proceedings. Ullrich Decl., Ex. G.

[5]  This defendant is also known as Terry Jan Mace.  Mace Dep. at 4:9-16.

[6]  This defendant is also known as Jerri A. Carsello.  Carsello Dep. at 4:9-13.

Gallagher[7], plaintiff Dennis Gallagher, Majors and Johnson entered into an oral agreement ("the Oral Agreement") whereby Majors and the Gallaghers would ultimately each own a one-half interest in the 709 Property.  Id. ¶ 5.  Per the Oral Agreement, plaintiffs secured a written option to purchase Johnson's one-third interest in the 709 Property, and Majors agreed that he would transfer from the defendants the remaining one-sixth interest to get plaintiffs to the agreed-upon one-half interest in the property.  Id.; Ullrich Decl., Ex. 1 (Doc. No. 99-4 at 1).  Plaintiff Dennis Gallagher and his father were reassured that the restructuring that resulted in the defendants' ownership of the 709 Property would not affect the Oral Agreement.  Gallagher Decl. ¶ 5.  In reliance on the Oral Agreement, plaintiffs continued to provide all custom farming services for the 709 Property at cost and took no management fee for over twenty years.  Id. ¶ 6.

Although there was no agreement to pay the defendants any sum of money for the eventual transfer of a one-sixth interest in the 709 Property, Gallagher Dep. at 39, there did exist a written option agreement that Majors prepared concerning that transfer to the plaintiffs.  Gallagher Dep. at 77-82; Majors Dep., Ex. B.  Over the course of the years, plaintiff Dennis Gallagher asked Majors multiple times when this option agreement would be signed by the defendants and was continually reassured that the defendants' signatures would be obtained.  Gallagher Dep. at 78.  This option agreement was never signed by the defendants.  Id. at 77-82.

After the defendants acquired the two-thirds interest in the 709 property, an entity called "JHW Farms"[8] was formed.  Gallagher Decl. (Doc. No. 22) ¶ 5.  JHW Farms became the entity that operated the 709 property.  Id.

III.    The Written Contract

In December 2006, plaintiff Dennis Gallagher met with the defendants to give the history of the 709 property, to discuss the farming and management services he provided over

---

[7]  Robert Gallagher eventually transferred all of his rights in the 709 property to his son, plaintiff Dennis Gallagher.  Gallagher Decl., ¶ 5.

[8]  "JHW" stands for Johnson, Holt and Wells.  See Mace Dep. At 20.

the years, and to tell the defendants that, per the Oral Agreement, he was supposed to own a one-half interest in the 709 Property.  Gallagher Decl. ¶ 6; Mace Dep. at 39.  Plaintiff Dennis Gallagher also discussed the intended transfer of a one-sixth interest in the 709 Property to him. Gallagher Decl. ¶ 6.  In exchange for the transfer, he agreed to pay for all closing costs. Gallagher Decl. ¶ 6.  Defendants first learned of the Oral Agreement during this meeting.  Mace Dep. at 39.

In their dealings with plaintiff Dennis Gallagher, defendants were assisted by their uncle, Jack Majors, who conducted independent research into the Oral Agreement and the history of the 709 Property.  Gallagher Decl. ¶ 9; Carsello Dep. at 18.

After their December 2006 meeting with the defendants, plaintiffs prepared a contract entitled the "Real Property Transfer Agreement with Escrow Instructions" ("the Contract").  Gallagher Decl. ¶ 7; see Compl., Ex. A.  The Contract provided for the transfer of an undivided one-twelfth interest of the 709 property from each defendant to the plaintiffs, for a total transfer of a one-sixth interest.  Id.  The stated purpose of the transfer was "to complete the agreement among the parties as to how title shall be held after payment of all third party debts on the Property that existing in 1980, which debts have been paid."  Compl., Ex. A.  In Section 4.4.4 of the Contract, plaintiffs agreed to pay "all closing costs, including transfer taxes, recording fees, escrow fees and related charges."  Id.  Had the transaction closed, these costs would have totaled $3,960.70.  Gallagher Decl. ¶ 7; Sanguinetti Decl. ¶ 5.

On January 5, 2007, plaintiffs signed the Contract.  Gallagher Decl. ¶ 7.  On February 28, 2007, defendant Terry Mace signed the Contract.  Compl., Ex. A.  When she signed it, she understood that she was agreeing to transfer the land described in the Contract to the plaintiffs.  Mace Dep. at 9:24–10:5.  She testified that although she did not read the Contract before signing it, no one prevented her from reading it.  Id. at 8:25–9:8.  She also testified that she signed the Contract because "it was the right thing to do" in light of the information she had received from Jack Majors and the plaintiffs regarding the Oral Agreement.  Id. at 20:7-9.

/////

On March 3, 2007, defendant Jerri Carsello signed the Contract.  Compl., Ex. A. She, too, signed it with the understanding that it was an agreement to transfer the 709 property to plaintiffs.  Carsello Dep. at 11:5-9.  Carsello testified that she did not read every word of the Contract before signing it, though she could have had she chosen to do so.  Id. at 9:8-15.  She also testified that although she did not have an attorney representing her when she signed the Contract, she could have had she chosen to do so.  Id. at 9:16-21.  She stated that there was no one present forcing her to sign the documents.  Id. at 9:13-15.

In anticipation of the transfer, plaintiffs opened an escrow account with Placer Title Company.  Gallagher Decl. ¶ 11.

IV.     The Breach of the Contract

Following the execution of the Contract, a separate agreement ("the Borel Agreement") was drafted and intended to be signed by defendants and by Johnson, who was represented through a power of attorney by his daughter, Sherri Johnson.  Carsello Dep. at 10:5-10; Ullrich Decl., Ex. 1.  Per the Borel Agreement, plaintiff Dennis Gallagher was scheduled to receive a $200,000.00 wire transfer from JHW Farms "for [ ] management and consulting services" that he had provided for the 709 property.  See Gallagher Dep., Ex. 5 ¶ 3.

On March 7, 2007, a wire transfer to plaintiff Dennis Gallagher was attempted in the amount of $200,000.00.  Mace Dep. at 10.  Defendant Terry Mace received a call from the bank regarding the transfer whereupon she first became aware of the Borel Agreement.  Id. at 15-16.  Defendants stopped the wire transfer and then cancelled the Contract for the transfer of the 709 Property.  Id. at 10, 15.  Both defendants testified that they did so because they felt the parties to the Contract and the Borel Agreement – the plaintiffs, Jack Majors, and Sherri Johnson – were not forthright with them.  Mace Dep. at 43-44; Carsello Dep. at 13-14.  Carsello testified that she canceled the Contract because she "just thought it would be a right of mine to cancel an agreement or a contract.  I – I just felt like if you changed your mind, you could do that."

5

1  /////

2  Carsello Dep. at 14:9-17, 34:22-25.  Holt stated in her deposition that she "did not want this

3  transaction to go through."  Holt Dep. at 10:6-8, 27:17-19.

4  On May 8, 2007, following the defendants' cancellation of the contract, plaintiff

5  Dennis Gallagher exercised his written option and purchased Johnson's one-third interest in the

6  709 property for $600,000.00, the amount he owed under the Oral Agreement.  Gallagher Decl.

7  (Doc. No. 22) ¶ 6; Ullrich Decl., Ex. A.  Plaintiffs calculate this date as the actual date of the

8  breach of the Contract because they expected the escrow to close on this day.  See Gallagher

9  Decl. ¶ 13.

10  RELEVANT PROCEDURAL BACKGROUND

11  On December 17, 2008, plaintiffs filed the operative complaint with jurisdiction

12  based on diversity.  Plaintiffs brought claims for specific performance and for damages for

13  breach of contract.  On May 19, 2009, defendants answered.  On December 30, 2009, the parties

14  filed cross motions for summary judgment.  On May 28, 2009, a scheduling order issued and a

15  jury trial was scheduled for April 19, 2010.  Doc. No. 14.  While their motions for summary

16  judgment were pending and in preparation for a February 25, 2010 pretrial conference, the

17  parties submitted a joint pretrial conference statement dated February 18, 2010.  Doc. No. 49.

18  On February 24, 2010, plaintiffs' motion for summary judgment was granted and

19  defendants' motion for summary judgment was denied after the undersigned found that the

20  Contract did not recite adequate consideration.  Judgment was entered and this case was closed.

21  Plaintiffs thereafter appealed, and in June 2011, the Ninth Circuit reversed this

22  court's judgment as to plaintiffs' action for damages for breach of contract after holding that an

23  action at law need not involve a determination of the adequacy of consideration.  This case was

24  thereafter reopened and the matter set for trial for August 27, 2012.  Pending before the court are

25  the parties' cross motions for summary judgment.

26  Also pending is defendants' April 18, 2012 motion for relief from stipulation.

1   Plaintiffs partially oppose this motion.

2                                    STANDARDS

3          Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant

4   summary judgment if the movant shows that there is no genuine dispute as to any material fact

5   and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[9]  A shifting

6   burden of proof governs motions for summary judgment under Rule 56.  Nursing Home Pension

7   Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir.

8   2010).  Under summary judgment practice, the moving party

9          always bears the initial responsibility of informing the district court of the basis
           for its motion, and identifying those portions of "the pleadings, depositions,
10         answers to interrogatories, and admissions on file, together with the affidavits, if
           any," which it believes demonstrate the absence of a genuine issue of material
11         fact.

12  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56©).

13  "Where the non-moving party bears the burden of proof at trial, the moving party need only

14  prove that there is an absence of evidence to support the non-moving party's case."  In re Oracle

15  Corp. Sec. Litig., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ.

16  P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not

17  have the trial burden of production may rely on a showing that a party who does have the trial

18  burden cannot produce admissible evidence to carry its burden as to the fact").

19         If the moving party meets its initial responsibility, the opposing party must

20  establish that a genuine dispute as to any material fact actually does exist.  See Matsushita Elec.

21  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986).  To overcome summary

22  judgment, the opposing party must demonstrate the existence of a factual dispute that is both

23  material, i.e., it affects the outcome of the claim under the governing law, see Anderson v.

24

25         [9]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10,
    2010.  However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule
26  56, "[t]he standard for granting summary judgment remains unchanged."

1   Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Fortune Dynamic, Inc. v. Victoria's Secret Stores

2   Brand Mgmt., Inc., 618 F.3d 1025, 1031 (9th Cir. 2010), and genuine, i.e., "'the evidence is such

3   that a reasonable jury could return a verdict for the nonmoving party,'" FreecycleSunnyvale v.

4   Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010) (quoting Anderson, 477 U.S. at 248).  A

5   party opposing summary judgment must support the assertion that a genuine dispute of material

6   fact exists by:  "(A) citing to particular parts of materials in the record, including depositions,

7   documents, electronically stored information, affidavits or declarations, stipulations . . . ,

8   admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do

9   not establish the absence or presence of a genuine dispute, or that an adverse party cannot

10   produce admissible evidence to support the fact."[10]  Fed. R. Civ. P. 56(c)(1)(A)-(B).  However,

11   the opposing party "must show more than the mere existence of a scintilla of evidence."  In re

12   Oracle Corp. Sec. Litig., 627 F.3d at 387 (citing Anderson, 477 U.S. at 252).

13         In resolving a summary judgment motion, the evidence of the opposing party is to

14   be believed.  See Anderson, 477 U.S. at 255.  Moreover, all reasonable inferences that may be

15   drawn from the facts placed before the court must be viewed in a light most favorable to the

16   opposing party.  See Matsushita, 475 U.S. at 587; In re Oracle Corp. Sec. Litig., 627 F.3d at 387.

17   However, to demonstrate a genuine factual dispute, the opposing party "must do more than

18   simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record

19   taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

20   'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

21                               ANALYSIS

22   I.     Plaintiffs' Motion for Summary Judgment

23         Plaintiffs seek summary adjudication on the following: (1) the parties entered into

24

25       [10]  "The court need consider only the cited materials, but may consider other materials in
the record."  Fed. R. Civ. P. 56(c)(3).  Moreover, "[a] party may object that the material cited to
support or dispute a fact cannot be presented in a form that would be admissible in evidence."

26   Fed. R. Civ. P. 56(c)(2).

1    a valid and enforceable contract, (2) defendants breached the contract without justification; (3)

2    defendants' breach is the legal cause of damages to the plaintiffs; (4) as a result of the

3    defendants' breach, the plaintiffs lost the fair market value of an undivided one-sixth interest in

4    the property as of May 8, 2007, and one-sixth of the net annual income for the 2007, 2008, 2009,

5    2010 and 2011 rice crop seasons; and (5) the plaintiffs lost one-sixth of the net annual income

6    for the 2007-2010 rice crops seasons in the sum of $174,746.27.  Plaintiffs aver that the only

7    remaining issues to be tried are (1) the fair market value of an undivided one-sixth interest in the

8    property as of May 8, 2007 and (2) the amount lost in net rice crop income for the 2011 season.

9           A.    Breach of Contract

10                 In order to succeed on their breach of contract claim, plaintiffs must prove the

11   following: (1) the existence of a contract, (2) plaintiffs' performance or excuse for

12   nonperformance, (3) defendants' breach of the contract, and (4) the resulting damages to

13   plaintiffs.  Reichert v. General Ins. Co. of America, 68 Cal. 2d 822, 830 (Cal. 1968).

14                 1.    Contract

15                 Pursuant to California Civil Code § 1550, the following essential elements must

16   be present for a finding of the existence of a contract: (1) parties capable of contracting; (2) their

17   consent; (3) a lawful object; and, (4) a sufficient cause or consideration.

18                        a.    Parties Capable of Contracting

19                 "All persons are capable of contracting, except minors, persons of unsound mind,

20   and persons deprived of civil rights."  Cal. Civ. Code § 1556.  There is no genuine dispute of

21   material fact as to whether either of the defendants were capable of contracting.

22                        b.    Consent

23                 The consent of the parties to a contract must be: (1) free; (2) mutual; and, (3)

24   communicated by each to the other.  Cal. Civ. Code § 1565.  Mutual consent is based on whether

25   an objective, reasonable person would, from the conduct of the parties, conclude there was a

26   mutual agreement.  Roth v. Malson, Cal. App. 4th 552, 557 (1998).

/////

In their opposition and moving papers, defendants argue that consent was lacking as to the Contract because there existed a mistake of fact and mistake of law.  California law permits rescission of a contract when a party's consent is given by mistake.  Cal. Civ. Code § 1689.  Pursuant to Section 1689, a party may rescind "[i]f the consent of the party rescinding, or of any party jointly contracting with him, was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party."

California Civil Code § 1577 provides:

Mistake of fact is a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in:

1. An unconscious ignorance or forgetfulness of a fact past or present, material to the contract; or,

2. Belief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed.

Generally, a mistake of fact occurs when a person understands the facts to be other than they are. Reid v. Landon, 166 Cal. App. 2d 476, 483 (Cal. Ct. App. 1958) (internal citations omitted). Under Section 1577, not any and every mistake is remediable.  Reid v. Landon, 166 Cal. App. 2d 476 (Cal. Ct. App. 1958).  Proof of mistake should be clear, convincing and satisfactory to the trial court.  Ciulla v. Telschow, 152 Cal. App. 2d 597, 600 (Cal. Ct. App. 1957).  Finally, any failure on the defendants' part to make a reasonable inquiry is not a sufficient basis for invalidating a contract.  See, e.g., Wal–Noon Corp. v. Hill, 45 Cal. App. 3d 605, 615 (Cal. Ct. App. 1975) ["[f]ailure to make reasonable inquiry to ascertain or effort to understand the meaning and content of the contract ... constitutes neglect of a legal duty such as will preclude recovery for unilateral mistake of fact"].)

Defendants argue that there existed a mistake of fact in that they were unaware that plaintiffs' claims to the 709 Property were not legally enforceable.  They assert that, had

they known that these claims were unenforceable, they would not have signed the Contract. Not only do defendants fail to submit any evidence in support of this argument, the undisputed evidence shows that defendants were in fact aware that plaintiffs' claims were not legally enforceable. In an email dated January 13, 2007 between defendants and Jack Majors, their uncle who was helping them in this matter, Majors informed defendants of the following:

> *First of all, from what I know, with there being no letters of agreement or paper trail on the transfer of the additional land to Dennis, that it probably would not hold up in court.* However, that may be ignoring the realities of what took place. It is hard for me to comprehend that there could have been a lien on the property without Gene [Majors]'s knowledge and consent. Why Gene never told you about it I don't know. Evidently this also involved a "gentlemen's agreement" regarding the 50% ownership by Al that has been in effect for years; and both Al Johnson and Dennis have been of this same opinion. I am also assuming that Dennis has been making payments to Al in order to clear him out of the picture. *So, the "right" thing may be different than the "legal" thing.*

Ullrich Decl., Ex. 4 (Doc. No. 99-19 at 7-8) (emphasis added); see Majors Dep. 37:8–39:9. The record also shows that between December 2006, when plaintiff Dennis Gallagher first spoke to the defendants, and late-February / early-March 2007, when defendants signed the Contract, they had numerous conversations with Dennis Gallagher and Jack Majors regarding the history of the 709 Property. Lastly, in their Joint Pretrial Conference Statement filed February 18, 2010, defendants admitted that they knew about the earlier oral agreement between plaintiff Dennis Gallagher, Allen Johnson, and Kenneth Majors. See Doc. No. 37 at 26, ¶ 41. There is simply no evidence of a mistake of fact here.

Defendants also contend they were mistaken about being morally bound to uphold the Oral Agreement yet defendants submit no evidence that they were under a moral directive to sign the Contract. Moreover, in their depositions, defendants testified that they were not forced to sign the Contract, that they had sufficient time to read the Contract, and that they could have consulted with an attorney if they wished. See, e.g., Mace Dep. 9:6-10; Carsello Dep. 9:8-21. Again, there is no evidence of mistake of fact here.

Next, California Civil Code § 1578 provides:

Mistake of law constitutes a mistake, within the meaning of this Article, only when it arises from:

> 1. A misapprehension of the law by all parties, all supposing that they knew and understood it, and all making substantially the same mistake as to the law; or,

> 2. A misapprehension of the law by one party, of which the others are aware at the time of contracting, but which they do not rectify.

Defendants argue that there existed a mistake of law in that they believed they were under a legal duty to sign the Contract.  As noted, however, the undisputed evidence shows that defendants were aware they were not under a legal duty to sign the Contract.  Majors's January 13, 2007 email to the defendants informed them that there did not exist a legal duty to sign the Contract.  The court thus finds no evidence of mistake of law.

Accordingly, the court finds no evidence of mistake, and further finds that the defendants gave informed consent.

### c.   Lawful Object

Next, "[t]he object of a contract must be lawful when the contract is made, and possible and ascertainable by the time the contract is to be performed."  Cal. Civil Code § 1596.  The Contract at issue here intended to transfer property from the defendants to the plaintiffs.  There is no dispute as to this element.

### d.   Sufficient Cause or Consideration

Lastly, there must exist a sufficient cause or consideration.  Consideration is defined as "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise."  Cal. Civil Code § 1605.

In this case, each defendant agreed to transfer an undivided one-twelfth interest in the 709 property to defendants, for a total undivided one-sixth interest.  See Gallagher Decl., Ex.

1   A.  Although the Contract states, "This transfer is to complete the agreement among the parties

2   as to how title shall be held after payment of all third party debts on the Property that existing in

3   1980, which debts have been paid," plaintiffs argue that in exchange for the transfer they agreed

4   to pay "all closing costs, including transfer taxes, recording fees, escrow fees and related

5   charges."  Id. at 2-3; Feb. 18, 2010 Joint Pretrial Conference Statement (Doc. No. 49) at 2.  As

6   plaintiffs point out, they had no pre-existing duty to pay for the closing costs and associated fees.

7   On these facts, the court finds that there existed good consideration for the defendants' promise.

8   See Kremen v. Cohen, 337 F.3d 1024, 1028 (9th Cir. 2003) ("The adequacy of consideration

9   doesn't matter, but it must be 'something of real value.'") (quoting Herbert v. Lankershim, 9 Cal.

10  2d 409, 475 (1937)).  Based on the foregoing, the court finds that the parties entered into a valid,

11  enforceable contract.

2.      Plaintiffs' Performance or Excuse for Nonperformance and the
        Defendants' Breach of the Contract

13          "In order to recover for breach of contract, the non-breaching party must prove

14  that it has substantially performed the conditions of the breaching party's performance (or that

15  performance was excused)."  Stop Loss Ins. Brokers, Inc. v. Brown & Toland Medical Group,

16  143 Cal. App. 4th 1036, 1051 (Cal. Ct. App. 2006).  California law recognizes that a contract

17  may be breached by nonperformance, by repudiation, or a combination of the two.  Central

18  Valley General Hosp. v. Smith, 162 Cal. App. 4th 501, 514 (Cal. Ct. App. 2008).  A repudiation

19  may be express or implied.  Taylor v. Johnston 15 Cal.3d 130, 137 (Cal. 1975).  An express

20  repudiation is a clear, positive, unequivocal refusal to perform.  Id.

21          In this case, the Contract established the following obligations on the parties:

22
23  4.2 Title. Title to the Real Property shall be conveyed on the closing of Escrow by
    the Grantor conveying to Grantee fee simple title to the Real Property by
    execution and delivery of a Grant Deed, as more fully provided below.

24
25  4.3 Conditions of Escrow.  The close of Escrow and Grantee and Grantor's
    obligations to purchase and sell the property pursuant to this Agreement are
26  conditioned on Grantor has deposited with Escrow Agent the following
    documents, duly executed in a manner allowing their recordation with the office

of the Sutter and Placer County Recorder's Office, as required:

> 4.3.1. Grant deed(s) as to the Real Property sufficient to convey fee title by Grantor to Grantee.

> 4.3.2. All other documents or instruments reasonably necessary or appropriate as required by the company issuing title insurance, Escrow Agent or either party's attorney.

> 4.3.3. Grantee specifically waives any requirement that title insurance be obtained on the Property and understands that there may be liens, claims and other matters which affect title of which Grantee is not aware and accepts such risk.

Gallagher Decl., Ex. A at 2.  Examination of the Contract, then, reveals that a necessary precondition for the close of escrow was the defendants' delivery of the Grant Deed and other documents to the Escrow Agent.  Following receipt of the Grand Deed and the other documents, the Escrow Agent would record the Grant Deed, deliver to plaintiffs all documents conveying title to them from the defendants, and, lastly, plaintiffs would pay "all closing costs, including transfer taxes, recording fees, escrow fees and related charges." Id. at 3.

In their opposition and moving papers, defendants claim that they "never deposited their respective deeds conveying a 1/12th interest to plaintiffs with the escrow agent." Defs.' Opp'n at 6.  Because they did not submit these documents, they claim that their obligation to sell never arose.  In other words, defendants argue that their obligation under the Contract was the transfer of the land at issue to the plaintiffs, and that this obligation was triggered only when they deposited the necessary paperwork with the Escrow Agent.  Because they did not deposit this paperwork, their duty to transfer the property under the Contract never arose.  Defendants, however, cannot refer to their initial breach of the Contract to justify their later non-performance.

The close of escrow was premised on the defendants' deposit of the necessary documents to the Escrow agent and then on the plaintiffs' payment of related fees and expenses.  But escrow never closed because, according to the defendants, they "stopp[ed] the transaction." Mace Dep. 10:6-8, 16:13-14, 27:17–28:3.  They "called out there and canceled this whole thing . . . . So we just canceled everything." Carsello Dep. 13:24–14:8, 14:14-19.  Defendant Holt

(Carsello) testified that she "just thought it would be a right of [hers] to cancel an agreement or a contract. I – I just felt like if you changed your mind, you could do that." Id. 14:14-16. By failing to file the Grant Deed and the other necessary documents, which defendants readily admit they did not do, they effectively expressly repudiated the Contract and thereby excused the plaintiffs' non-performance.

Plaintiffs, on the other hand, in anticipation of completing the transfer of the property to them, opened an escrow account with Placer Title Company. Gallagher Decl., ¶ 10; Ex. A at 2-3. Plaintiffs were and have always been ready, willing and able to sign any documents and pay all costs necessary to complete the transfer. Gallagher Decl., ¶ 13.

Based on the foregoing, the court finds that plaintiffs were excused from performing under the Contract based on the defendants' express repudiation of the Contract.

4.    Resulting Damages to Plaintiffs

California Civil Code § 3300 provides: " For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

"The basic object of damages is compensation, and in the law of contracts the theory is that the party injured by a breach should receive as nearly as possible the equivalent of the benefits of performance." Brandon & Tibbs v. George Kevorkian Accountancy Corp., 226 Cal. App. 3d 442, 455 (Cal. 1990) (citing Cal. Civ. Code, § 3300. "The aim is to put the injured party in as good a position as he would have been had performance been rendered as promised. This aim can never be exactly attained yet that is the problem the trial court is required to resolve." Id.

Plaintiffs claim that they have been damaged by the defendants' breach and seek relief pursuant to California Civil Code § 3306, which provides that, for a breach of a contract to convey real estate, "[t]he detriment caused by the breach of an agreement to convey an estate in

1  real property, is deemed to be the price paid, and the expenses properly incurred in examining

2  the title and preparing the necessary papers, the difference between the price agreed to be paid

3  and the value of the estate agreed to be conveyed at the time of the breach ["the market-contract

4  differential"], the expenses properly incurred in preparing to enter upon the land, consequential

5  damages according to proof, and interest."  Cal. Civ. Code § 3306.

6        Plaintiffs assert that as a result of the defendants' breach, they lost the fair market

7  value of an undivided one-sixth interest in the 709 Property, and one-sixth of the net annual rice

8  crop income for the 2007-2011 rice crop seasons, plus interest.  Gallagher Decl. ¶¶ 11-19.

9  Plaintiffs also claim that they incurred attorneys' fees and costs to enforce the Contract.  Id.

10        a.    General Damages

11        When defendants breached the Contract, plaintiffs lost not only the value of an

12  undivided one-sixth interest in the 709 property, but they also lost income from rice farming on

13  that property.  Thus, as a result of defendants' breach, plaintiffs became entitled to damages as

14  specified in Section 3306.  Here, the measure of plaintiffs' damages is the difference between the

15  purchase price and the fair market value of an undivided one-sixth interest in the 709 Property as

16  of May 8, 2007, the date of breach (the market-contract differential), plus consequential damages

17  according to proof.  Cal. Civ. Code, § 3306; Reese v. Wong, 93 Cal. App. 4th 51, 55-56 (Cal. Ct.

18  App. 2001); Al–Husry v. Nilsen Farms Mini–Market, Inc., 25 Cal. App.4th 641, 651 & fn.16

19  (Cal. Ct. App. 1994); Stevens Group Fund IV v. Sobrato Dev't Co., 1 Cal. App. 4th 886, 892

20  (Cal. Ct. App. 1991).

21        Plaintiffs rely on the Contract and the declaration of Kevin Sanguinetti, an expert

22  opining on the amount of the escrow fees and closing costs associated with the Contract, to show

23  that the figure totaled $3,960.70.  Gallagher Decl. ¶ 13; Sanguinetti Decl., ¶¶ 1-5.  Defendants

24  argue that this figure is in dispute and should be obtained directly from Placer Title Company in

25  order to obtain either actual or estimated costs.  Defs.' Opp'n at 5.  Defendants, however, submit

26  no evidence in support.  Thus, the court finds that there is no factual dispute as to this figure.

/////

As to the fair market value of an undivided one-sixth interest in the 709 Property at the time of the breach, plaintiffs submit the declaration of expert witness Michael Evans, who opines on the value of this property.  Defendants counter with their expert witness Ralph Pavey, who also opines on the value of the property.  In light thereof, the court finds that there exists a dispute of material fact as to the fair market value of an undivided one-sixth interest in the 709 Property.

In their opposition and moving papers, defendants argue that the $3,960.70 price referenced by the plaintiffs should be construed as "expenses" under Section 3306 rather than "price agreed to be paid."  They further argue that, because plaintiffs have not actually incurred any expenses and because they have proffered no other contract price, their general damages claim fails as a matter of law.  Defendants, however, cite to no authority holding that the payment of expenses cannot serve as consideration for a real property contract, and their argument as to language construction is unconvincing.  Additionally, defendants assert that "price agreed to be paid," as used in Section 3306, is a price paid *to the seller*.  This is a baseless assertion.  Furthermore, insofar as "price agreed to be paid" is interchangeable with "consideration," California Civil Code § 1605 defines "consideration" as "Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, *or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer*, as an inducement to the promisor, is a good consideration for a promise."  (Emphasis added.)  Thus, the "price agreed to be paid" is *either* a benefit conferred on the defendants *or* a prejudice suffered by the plaintiffs.  As noted <u>supra</u>, the payment of costs and fees associated with the transfer of an undivided one-sixth interest in the 709 Property was a prejudice plaintiffs suffered, one which they were not legally obligated to suffer.

Moreover, even if the court did adopt defendants' position that the $3,960.70 that

17

1    plaintiffs agreed to pay is an expense, defendants' argument fails on other grounds.  Defendants

2    contend that, because plaintiffs did not incur any expenses (that is, they did not actually make

3    any payments towards the transaction costs), and further because there does not exist a separate

4    monetary value for the "price agreed to be paid," then plaintiffs' damages claim fails because (a)

5    the lack of a monetary value for the "price agreed to be paid" renders the market-contract

6    differential zero, thus prohibiting plaintiffs from recovering any general damages, and (b) if

7    plaintiffs do not recover general damages, then plaintiffs are also prohibited from recovering

8    consequential damages.  The cases relied on by defendants in support of these arguments are

9    unavailing.  As noted earlier, Section 3306 allows for the recovery of the following for the

10   breach of a real estate contract: "[1] the price paid, and the expenses properly incurred in

11   examining the title and preparing the necessary papers; [2] the difference between the price

12   agreed to be paid and the value of the estate agreed to be conveyed at the time of the breach ["the

13   market-contract differential"]; [3] the expenses properly incurred in preparing to enter upon the

14   land; [4] consequential damages according to proof; and [5] interest."  If the court deems the

15   $3,960.70 is properly construed as "expenses" (which, incidentally, would not negate the court's

16   finding that it is good consideration), then there is no dispute that plaintiffs would not be entitled

17   to recover for "[1] the price paid, and the expenses properly incurred in examining the title and

18   preparing the necessary papers" and "[3] the expenses properly incurred in preparing to enter

19   upon the land" because plaintiffs have not actually incurred any expenses.

20          As to the market-contract differential, defendants argues that plaintiffs cannot

21   recover because the "price agreed to be paid" now lacks a monetary value.  The cases cited in

22   support, however, hold only that a plaintiff is not entitled to damages if the market-price

23   differential is zero (that is, there is no difference between the price agreed to be paid and the fair

24   market value at time of breach) or when there is a sum uncertain as to the fair market value.  See,

25   e.g., Horning v. Shilberg, 130 Cal. App. 4th 197, 206 (Cal. Ct. App. 2005) (holding that a

26   plaintiff may not recover damages if they fail to submit any evidence of the fair market value of

18

the property on the date of the breach).  See also Marsh v. Lott, 156 Cal. 643, 651 (Cal. 1909) (holding that plaintiff was not entitled to damages for failure to establish a difference between fair market value at time of breach and the price agreed to be paid); Baran v. Goldberg, 86 Cal. App. 2d 506, 511-13 (Cal. Ct. App. 1948) (holding plaintiffs were not entitled to damages because there was no showing that the value of the property at the time of the breach was greater than the contract price, and there was no proof of fair market value at time of breach); McRae v. Ross, 170 Cal. 74, 78 (Cal. 1915) (relying on the pre-1983 amendments to Section 3306, the court denied damages on finding that no expenses were incurred and there was no bad faith to justify damages for the market-contract differential[11]); Wilson v. White, 161 Cal. 453, 466 (Cal. 1911) (same).  Yet here there is no value uncertain: if the $3,960.70 is deemed "expenses," then the "price agreed to be paid" is $0, and therefore the plaintiffs' recovery would be based on the difference between the fair market value at the time of breach, to be determined at trial, and $0.  Defendants present no cases that hold that plaintiffs may not recover under the market-contract differential if the "price agreed to be paid" is zero.  Lastly, as to defendants' argument that consequential damages are not recoverable absent a market-contract differential, this conclusion is neither in the language of Section 3306 nor in any case law cited by defendants.  See also Greenwich S.F., LLC v. Wong, 190 Cal. App. 4th 739, 758 (Cal. Ct. App. 2010).

          Notwithstanding the foregoing, the court declines defendants' invitation to distinguish between the consideration set forth in the Contract and the "price agreed to be paid." Accordingly, the payment of all fees and closing costs will be deemed the "price agreed to be paid" under Section 3306.  The market-contract differential, then, would be the fair market value

---

[11] Prior to the 1983 amendments to Section 3306, recovery for an aggrieved buyer was limited to expenses incurred and, in the case of bad faith, the market-contract differential.  In 1983, Section 3306 was amended to eliminate a requirement of bad faith and to add consequential damages and interest.

of an undivided one-sixth interest in the 709 Property minus $3,960.70.[12]

b.    <u>Special Damages</u>

"[L]ost profits may [also] be awarded as part of consequential damages under section 3306 upon a proper showing."  <u>Greenwich</u>, 190 Cal. App. 4th at 758.  "Not only must such damages be pled with particularity, but they must also be proven to be certain both as to their occurrence and their extent, albeit not with 'mathematical precision."  <u>Lewis Jorge Const.</u> <u>Mgmt, Inc. v. Pomona Unified School Distr.</u> 34 Cal. 4th 960, 975 (Cal. 2004) (internal citations omitted).

Plaintiffs seek their loss of annual rice crop income for the 2007-2011 years.  In support, plaintiffs have submitted evidence of the net annual rice crop income for the 2007-2010 rice crop seasons.  Gallagher Decl. ¶¶ 2, 15-17; Exs. B1–B5.  They value this loss at $136,790.45, excluding interest.  Plaintiffs reserve for trial the value of the annual rice crop income for 2011.

In opposition, defendants submit the declaration of Dennis Diver, a certified public accountant who was hired by the administrator of Kenneth Majors's estate to conduct a forensic accounting of all farming operations and entities Kenneth Majors was involved in with plaintiff Dennis Gallagher.  <u>See</u> Diver Decl., Attach.  He has also worked on Kenneth Majors's federal estate tax return for an unspecified year(s).  Diver Decl. at 2.  Diver spent approximately 58 hours rendering services for the estate from July 2009 through January 2010.  <u>Id.</u>  Diver's opinion here is based on a review of plaintiff Dennis Gallagher's declaration and, inter alia, the aforementioned supporting documentation relating to the annual rice crop income for the 2007-2010 years.  <u>Id.</u>  Diver partially agrees with the value of the rice crop income but for a $1,086.74

---

[12]  In their Reply to plaintiffs' Opposition to defendants' motion for summary judgment, defendants present a new ground for relief pursuant to California Civil Code § 1670.5, which authorizes a court to refuse to enforce a contract if it, or portions of it, are found to be unconscionable.  Defendants, however, may not raise new grounds for relief in a responsive brief.  <u>United States v. Puerta</u>, 982 F.2d 1297, 1300 n.1 (9th Cir. 1992).

1   double-charge for a "Retains" payment on October 17, 2008; finds that the supporting

2   documentation as to property taxes appears to be incomplete in that there are $27,185.29 of

3   undocumented property taxes; and determines that a 2009 pump repair in the amount of

4   $5,935.83 is not included in the data.  See Diver Decl. at 3.  Diver concludes that these issues

5   must be resolved before the $136,790.45 figure submitted by plaintiffs can be accepted.

6           Plaintiffs object to Diver's declaration on the grounds that Diver was not

7   designated as an expert witness nor did he prepare an expert report as required, and the opinions

8   expressed in Diver's declaration are based on speculation and not personal knowledge.

9           Defendants argue that Diver is not an expert witness, but is instead "akin to a

10  private investigator being called to testify as to what he or she observed of an accident site and

11  not to render an opinion as to the cause of the accident."  Defs.' July 19, 2012 Pretrial

12  Conference Statement at 5.

13          Under Federal Rule of Evidence 701, lay witnesses may provide testimony that

14  goes beyond percipient observations and consists of opinions or inferences:

15          If the witness is not testifying as an expert, the witness' testimony in the form of
            opinions or inferences is limited to those opinions or inferences which are (a)
16          rationally based on the perception of the witness, (b) helpful to a clear
            understanding of the witness' testimony or the determination of a fact in issue,
17          and (c) not based on scientific, technical or other specialized knowledge within
            the scope of Rule 702.
18
    Fed. R. Evid. 701.
19
            Federal Rule of Evidence 702 provides:
20
            If scientific, technical, or other specialized knowledge will assist the trier of fact
21          to understand the evidence or to determine a fact in issue, a witness qualified as
            an expert by knowledge, skill, experience, training, or education, may testify
22          thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
            sufficient facts or data, (2) the testimony is the product of reliable principles and
23          methods, and (3) the witness has applied the principles and methods reliably to
            the facts of the case.
24
    Fed. R. Evid. 702.
25
            While the text of Rule 701 appears to clearly separate lay opinion testimony from
26

that of experts, the advisory committee note regarding subsection (c) makes the distinction less

obvious.  For instance, a lay witness may testify to the value of property or expected profits

without the necessity of qualifying the witness as an accountant, appraiser, or similar expert.

Fed. R. Evid. 701 Advisory Committee Notes to 2000 Amendment; see, e.g., Lightning Lube,

Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993).  Such lay opinion testimony is admissible not

because of experience, training or specialized knowledge within the realm of an expert, but

because of the "particularized knowledge that the witness has by virtue of his or her position in

the business."  Id.  See Hynix Semiconductor, Inc. v. Rambus, Inc., 2008 WL 504098, at *4

(N.D. Cal. 2008) (noting that the business owner exception has survived the 2000 amendments to

Rule 701); Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 265 (2d Cir. 1995) ("[A]

president of a company, such as Cook, has personal knowledge of his business ... sufficient to

make ... him eligible under Rule 701 to testify as to how lost profits could be calculated.")

(internal citations and quotation marks omitted), cert. denied, 516 U.S. 1114 (1996); Medforms,

Inc. v. Healthcare Mgmt. Solutions, Inc., 290 F.3d 98 (2d Cir. 2002) (allowing a computer

programmer to testify about the meaning of copyright registration terms about which he had

personal knowledge); United States v. Munoz–Franco, 487 F.3d 25, 35 (1st Cir. 2007) (allowing

a bank employee to testify about banking practices due to his "knowledge and participation in

the day-to-day affairs of [the] business.") (quotation omitted); In re Merritt Logan, Inc., 901 F.2d

349, 359-60 (3d Cir. 1990) (allowing Rule 701 testimony by the principal shareholder

concerning the company's lost profits); Mississippi Chemical Corp. v. Dresser–Rand Co., 287

F.3d 359, 373 (5th Cir. 2002) (allowing company employee "to testify about the lost profits

caused by the defective compressor train").

       To the extent defendants intend to introduce Diver as a lay witness, this is

presumably done due to the forensic accounting services he provided for Kenneth Majors's

estate as a certified public accountant.  Yet as a forensic accountant, Diver will "unavoidably

render opinions, observations, conclusions or statements based on [his] specialized education,

1  training and experience," and it is evident that Diver's opinions are not based on personal

2  knowledge of the 709 Property.  See Hoot Winc, LLC v. RSM McGladrey Financial Process

3  Outsourcing, LLC, 2010 WL 3894966, at *2 (S.D. Cal. 2010) (holding that a forensic accountant

4  is an expert witness, not a lay witness); see also Wing v. Kaye Scholer, LLP, 2010 WL 5020576,

5  at *2-3 (D. Utah 2010) (same).  Based on the foregoing, the court finds that Diver's testimony is

6  admissible only as an expert witness, not a lay witness.  The court further finds that Diver's

7  testimony is inadmissible as an expert witness because of the defendants' failure to comply with

8  the Federal Rules of Civil Procedure and this court's scheduling order.  See Fed. R. Civ. P. 26,

9  37.

10      Accordingly, the court finds that plaintiffs' proof of annual rice crop income for

11  the 2007-2010 years is undisputed, and summary judgment will be entered on this claim.

12          c.      Interest

13      Additionally, plaintiffs seek prejudgment interest.  Cal. Civ. Code § 3306.

14  Because the Contract did not set forth a rate for interest, plaintiffs rely on the legal rate of 10%

15  per year.  See Cal. Civ. Code § 3289.  They thus calculate the prejudgment interest on the lost

16  rice crop income at $37,955.82.  Defendants do not dispute this.

17          d.      Attorneys' Fees

18      Lastly, plaintiffs seek attorneys' fees accumulated in prosecuting this action.

19  Defendants do not dispute this.

20      In summary, the court will grant plaintiffs' motion for summary judgment as set

21  forth supra.  The court also finds undisputed the value of the net annual rice crop income for the

22  2007-2010 years.  Plaintiffs are thus entitled to a total undisputed damages recovery of

23  $174,746.27.  Therefore, the only issues for trial are the fair market value of an undivided one-

24  sixth interest in the 709 Property, and the net annual rice crop income for the 2011 year.

25  II.  Defendants' Motion for Summary Judgment

26      A.      Ground One

1   In their opposition to plaintiffs' motion for summary judgment, defendants first

2   presented their argument that they were excused from performance under the Contract because

3   they did not deposit a Grant Deed with the Escrow Agent.  For the reasons set forth supra,

4   defendants are not entitled to summary judgment on this ground.

5   B.   Ground Two

6   Also in their opposition to plaintiffs' motion for summary judgment, defendants

7   first presented their argument that Section 3306 prohibits a damages award because plaintiffs

8   lack a monetary value for "price agreed to be paid," and because absent a market-contract

9   differential, plaintiffs may not seek consequential damages.  For the reasons set forth supra,

10   defendants are not entitled to summary judgment.

11   Accordingly, defendants' motion for summary judgment will be denied.

12   III.   Defendants' Motion for Relief from Stipulation

13   Finally, defendants have submitted a motion for relief from stipulation through

14   which they seek to be relieved of certain statements made in the February 18, 2010 joint pretrial

15   conference statement (Doc. No. 49) and related documents (Doc. Nos. 50-55).  The language at

16   issue concerns defendants' statements and admission as relate to the appropriate measure of

17   damages in this case.

18   Plaintiffs have agreed to relieve defendants from the following stipulations,

19   though plaintiffs contend that these would still be treated as evidentiary admissions:

20   •   "If Plaintiffs prevail on their breach of contract claim, Defendants agree
     Plaintiffs' damages for breach includes the value of an undivided 1/6 interest in
21     the 709 property pursuant to Michael H. Evans' expert testimony and report,
     which states that value as of May 8, 2007 as $666,666.67, excluding interest."

22
23   •   "With prejudgment interest calculated at the legal rate of 10% from May 8, 2007
     to January 28, 2010, the total amount of Plaintiffs' damages, if they prevail on
     their breach of contract claim is $985,178.82."
24
25   •   "Michael Evans' expert opinion is that the market value of the entire 709 property
     as of the valuation date of May 8, 2007 is $4,000,000.00."

26   Under federal law, stipulations and admissions in the pleadings are generally

24

1    binding on the parties and the Court.  <u>American Title Ins. Co. v. Lacelaw Corp.</u>, 861 F.2d 224,

2    226 (9th Cir. 1988).  Not only are such admissions and stipulations binding before the trial court,

3    but they are binding on appeal as well.  <u>Id.</u>  "Judicial admissions are formal admissions in the

4    pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the

5    need for proof of the fact.  <u>Id.</u>  Factual assertions in pleadings and pretrial orders, unless

6    amended, are considered judicial admissions conclusively binding on the party who made them."

7    <u>Id.</u>

8            Defendants argue that relief is warranted because they did not have an

9    opportunity to review the joint pretrial conference statement for more than a day before signing

10   it, defendants have obtained an expert witness who calls into question plaintiffs' expert opinion

11   concerning the value of the property at issue, and the most recent joint pretrial conference

12   statement should be admitted in lieu of the February 18, 2010 joint pretrial conference statement.

13   The court has reviewed defendants' motion and does not find good cause to grant the relief that

14   defendants seek except as to statements concerning the fair market value of an undivided one-

15   sixth interest in the 709 Property, and defendants' Section 3306 arguments as set forth in this

16   order.  Accordingly, this motion will be partially granted.

17           Based on the foregoing, IT IS HEREBY ORDERED that:

18           1.  Defendant's April 19, 2012 motion for summary judgment is denied;

19           2.  Plaintiff's April 19, 2012 amended motion for summary judgment is granted:

20                   A.      Summary judgment is entered in favor of plaintiffs on the question

21                           on their breach of contract claim.  The court finds that there

22                           existed a valid contract, that defendants breached the contract, and

23                           that the breach is the legal cause of plaintiffs' damages.

24                   B.      As a result of defendants' breach, plaintiffs lost the fair market

25                           value of an undivided one-sixth interest in the 709 Property as of

26                           May 8, 2007 and one-sixth of the net annual income for the 2007-

25

2011 rice crop seasons.

C.     The value of the net annual income for the 2007-2010 rice crop seasons for an undivided one-sixth interest in the 709 Property, plus interest, is $174,746.27.

D.     The only remaining issues to be tried are:

a.     The fair market value of an undivided one-sixth interest in the 709 Property as of May 8, 2007, and

b.     The value of the net annual income for the 2011 rice crop season for an undivided one-sixth interest in the 709 Property.

3.  Defendants' April 28, 2012 motion for relief from stipulation is partially granted as set forth in this order.

DATED: August 2, 2012.

_____
UNITED STATES MAGISTRATE JUDGE

/014;gall3071.msj2